some of what was going on, but now it's your turn, so I'll call the next case. Abdu Karim Pirani v. Baharia et al. Mr. Carroll. May it please the Court, Counsel. I'm Ken Carroll from Carrington-Coleman for the appellant Mr. Pirani. A review of the procedural history in this case, if there's one immutable truth that emerges from that, it is that folks sure can make things complicated. But happily, as we explained in our reply, this appeal really distills to three issues. First, as an assignee, Mr. Pirani was entitled to step into the shoes of his assignee or the bank and to enforce the guarantee against the co-guarantors, just as the bank would have with respect to the full amount of the deficiency, subject only to an offset or reduction to account for his contributive share as one of the co-guarantors. Two, H&M's claim that Mr. Pirani allegedly breached the settlement agreement by failing to get them released from their guarantees just doesn't bar Mr. Pirani's claims. First, this breach of contract claim is barred by res judicata because the H&M parties already went to final judgment on another claim for breach of that same contract and didn't secure this relief. But irrespective of that, the settlement agreement, which is really the focus of this appeal, just doesn't obligate Mr. Pirani personally to secure those releases. It just doesn't say what the H&M parties and the courts below say it said. Third, H&M is not entitled to attorney's fees for a variety of reasons, most particularly because they fail to deduce legally or factually sufficient evidence, the minimum evidence necessary, as the Texas Supreme Court put it, to establish a right to fees under the standard they articulated in El Apple and in Long v. Griffin. As time allows and subject, of course, to the Court's questions, I propose to address the issues in that order or certain aspects of them at least and then leave the rest to our briefs. The first issue, whether Mr. Pirani can pursue his claims as an assignee, itself breaks down into three sub-issues, and the first of those you would think would be pretty straightforward, that is whether a co-guarantor can ever purchase a debt and enforce it against his co-guarantees as a legal matter rather than an equitable matter or whether he is relegated simply to equitable rights and self-subrogation or contribution. I say it's straightforward because the Dallas Supreme Court in the 1997 Wyman decision and then the two later decisions that are published, the Byrd decision and the Lavender decision, all say expressly that a guarantor can go out and purchase the debt and enforce it against his co-guarantors. Can he enforce it in a greater amount than what he paid for it? Well, and that leads us to the second question. The question is what is the measure of recovery when he's allowed to do that? Is the measure of recovery the amount of the debt or is it simply the amount that he paid to secure the assignment? And this is where respectfully we believe that the courts went astray below. They gave lip service to the holdings in Byrd and Lavender that Mr. Pirani could as a co-guarantor act as an assignee, but then they say he's limited to a right of contribution solely for the amount that he paid to acquire the assignment of the debt. Respectfully, that's just fundamentally wrong because what that does is to conflate the legal contractual rights that Mr. Pirani obtained as an assignee with his equitable rights for subrogation or contribution that he would have irrespective of that assignment. If you look at what everyone knows in its fundamental law, and the cases in Byrd and Lavender both say, that an assignee steps into the ship. There is this other little oddity here that he has an obligation to obtain releases from those guarantees to these persons that he is now enforcing that debt against. Now, whether that dispute about, obviously, whether or not his obligation was honored or not to obtain the release of it, but he had undertaken to tell these co-guarantors that I'm going to get you released from those guarantees, and instead what he ends up doing is the suggestion in the writing here that he goes and settles with a bank and then turns around and wants to enforce the entire obligation, which would include the amounts for which they should have been released. Well, Your Honor, with respect... I mean, that's what you get from reading the briefs. I'm sorry to say if that's what you get from reading the briefs, at least our briefs, because our version of life is quite different on the first premise there, which is the second issue that I talked about earlier. We do not believe that Mr. Pirani ever undertook to secure the releases of these individuals from their guarantee. That's a good answer if, in fact, that's been determined and is out of the case. If Mr. Pirani did undertake to secure the guarantees, release of the guarantees, and did breach that, and he never did secure the release from those guarantees, then we may not have a lot more to talk about on this first issue. But, in fact... I'm saying that what functionally happens is that he enforces the guarantees against them. Yes. That's his goal. Because that, in fact, is what Byrd and Lavender say. They say that in those circumstances, Lavender in particular says, as the assignee steps into the shoes of the bank, in that case, the court may recall, there was a $100,000 CD which secured the debt. He was allowed to recoup that and not apply it to the debt. He was allowed then to go ahead and apply or seek recovery based upon, and I'm quoting here from Byrd and Lavender, the unpaid debt, the note, the total liability, the jointly owed amount. Now, there is a place where the Byrd case injects a point of confusion. At the very end of the Byrd case, they calculate the amount of Mr Byrd's liability based upon what the Nelms Partnership paid to get its share of the note. But if you go back in the opinion, you see that that was actually the total amount that was owed, so even though it used the term paid to calculate that, it's really the same thing. And if you look elsewhere in the Byrd opinion, at least three or four times, the court draws a distinction between rights of contribution and rights as an S&E and says that on the latter score, the recovery is based on the unpaid debt. Now, to go between the two points... Help me with this language, and maybe I just need to know the context of it. Byrd says the assignment of an underlying note and guarantee agreement to a guarantor does not change the status of guarantor in relation to his co-guarantors. So what about that? At least the sense I have of that is Byrd is saying once a guarantor or is a guarantor, you don't become the original creditor just because you have gotten an assignment. I think, Your Honor, the court in Lavender speaks to the very same thing and says when you become an S&E, you don't take off your guarantor hat and put on your S&E hat, to use the old-time-worn metaphor that we all heard. You wear both hats. And the way the Lavender court dealt with it was to say what that means is not that you then are simply relegated back to rights, equitable rights of contribution and indemnity or segregation. What happens is you have to take into account your own obligation as a co-guarantor. In the Lavender case, saying there are four guarantors, you, S&E, were responsible for one-fourth of that guarantee, so your reduction, even though it's predicated originally on the total debt, has to be reduced by your contributive share. You can only recover three-quarters of it. Now, there's an unbriefed issue that goes to the issue in Byrd there as well, where in the Byrd court they looked at it from the other direction. Instead of saying you reduce it from the top, they said you can only recover from your co-guarantors their proportionate shares. Now, in Lavender, it didn't matter. Math works the same way. Another unbriefed issue, though, is what's the effect of his earlier position saying that there really is no deficiency at all? Can he now come in and assert the deficiency that the bank alleges when previously in this case he said there wouldn't be a deficiency? Your Honor, I believe that that would be an evidentiary point, and it's an evidentiary point that was raised under 51.003. That's an affirmative defense that would have been raised by the H&M parties. Was it? Well, we think it was not. The bankruptcy court says it was, but in the end the bankruptcy court says because I'm finding that Mr. Pirani hasn't proved his case, I'm not going to reach any of the affirmative defenses. So they never did. I don't think there's any question. There's no judicial estoppel. Accepting that bankruptcy court position isn't your issue too, which you're about halfway through time. Actually, it precedes this issue that we're debating because if you lose on the second issue, whether or not he personally guaranteed the release, we wouldn't be dealing with this. That's true. And that's the reason we began our briefs with the other, but I felt we needed to. I'd love to hear moving to that element. I will. Maybe start for me in the stipulation of fact by him in the pretrial order that he said here's who the company is. Well, he doesn't say here's who the company is. I think there's two things about that stipulation. First of all, you have to read the language carefully. Secondly, you have to read the entire pretrial order, as you would any other agreement, to understand what it means. It says that the contract, the settlement agreement, defines the company to include Circle, Sherman, Aziz, and Parani. It does. That language is in the beginning of the settlement agreement. But it doesn't say in the pretrial order that that's the only definition or that that definition controls throughout the pretrial order. In fact, there are stipulations throughout the pretrial order of contested issues of fact and law that if that initial definition were to control, couldn't be stipulated to be in dispute because they would have been resolved by that. But then it seems to me even if you're right, all you've established is there's ambiguity, we've got to remand for a factual finding as to what the party's intended. If you agree that that definition at the outset is inconsistent with a later definition, but your position has been there's no ambiguity at all. Just because two parties disagree about what something means doesn't mean it's true. No, not because two parties. You're actually agreeing with them in the preamble statement. The position you just stated is, well, that definition would include them, I thought. But elsewhere you're saying 3.2 has got a different definition. It does. And Article IV has a different definition. And if the court reads the settlement agreement carefully throughout, again, as Morietti and the other Texas cases say must be done, you will find that almost without exception, notwithstanding that definition appearing in the preamble, the word company means Circle Sherman and only Circle Sherman. We've given examples in footnote 4. It happens to be footnote 4 in both of our briefs, the reply in the initial brief, which shows that if you read that as a matter of common sense, the term company throughout has to mean only Circle Sherman. Now, so we believe that in terms of the way the settlement agreement works, it simply does not obligate. We also believe, of course, as we've said in our briefs, that the obligation to secure releases is not absolute. There are conditions to do it. One of them is that there has to be a third-party investor. The other is that the release has to be done through a refinancing or a sale of the hotel, neither of which could happen at the point at which Mr. Parani had possession of the bank's guarantee rights. So we don't think in any event there's an obligation on Mr. Parani to secure the releases of the guarantees. Moreover, we submitted, as we did earlier, that that claim, it is a counterclaim for breach of contract, which we contend is barred by res judicata, because in their original cross-claim in the case in the state court, the H&M parties inserted a claim for breach of contract against Mr. Parani, and in that they included every breach of contract. They included the repurchase obligation, where he later got partial summary judgment, but they also explicitly alleged in that very first breach of contract, breach of settlement pleading, that a breach was the failure to secure those releases. That appears at page 1917 of the appellate record. They later got partial summary judgment on the repurchase issue, but not the other things. There was then the split of the case. The bank case stays in one place, and the breach of settlement agreement stuff between Mr. Parani and H&M goes over into the severance case. We contend that when that severance happened, the entire breach of contract claim went over into the severed case. There's later a judgment in that case. It does not award any relief based upon the failure to secure releases, and so that claim is now barred. Now, H&M says, whoa, whoa, whoa, whoa. The severance, that's not the way the severance worked. The only thing that went over in the severed case is the repurchase issue, and all the other stuff stayed in the bank case. Again, we disagree, but in fact, even if that happened, it doesn't really matter. It changes the rationale, but not the result, and the reason is that within a short time after the severance occurred, there was a dismissal without prejudice of all the claims in the bank case. The severance, the breach of contract case against Mr. Parani, continued for another couple of three months. During that time, obviously, those claims that had been dismissed without prejudice could have been brought anywhere. Certainly, they could have been added to the case against Mr. Parani, the severed case. So even if they weren't already over there, they sure could have been at that point. The Barr case, the Genicoff case, the Pinebrook case, all say that all claims with respect to a particular legal relationship, including a contract like this, should be brought at the same time. What do you ask us to do? What relief do you want from us? Well, we ask at the end of our briefs, frankly, for a reverse and render. I think what has to happen here because, as I said earlier, the bankruptcy court did not reach all of the affirmative defenses of the H&M parties. I think what needs to happen here is a reversal on the issues of how the enforcement of the guarantees works and on this issue of the settlement agreement, and the case has to go back for trial on those issues. But I would say that it needs to go back on an informed basis. On this issue of res judicata, there's a point. The courts below seem to get tied up in what happened in the bank case, and I want to make clear that we're not relying on the bank case. It's what happened in the severed case, the case between the H&M parties and Mr. Parani, that gives rise to the res judicata. And there's no question that the claim with respect to the alleged breach for failure to secure releases could have been brought there. It was, remember, part of the original breach of contract claim that the H&M parties did. And we have another piece of proof which is not in the appellate record because it was not before the bankruptcy court, but it is something of which this court can take judicial notice, particularly in a res judicata context. Three weeks before the final judgment in the severed case, the H&M parties filed an amended pleading in which they took out their attorney's fees to try to get to a final judgment on the repurchase partial summary judgment, but in that they reiterated claims about Mr. Parani not having secured the releases from the guarantees. They went to judgment after having filed that. The judgment granted relief only on the issue of repurchase and denied all other relief. So we respectfully submit res judicata bars that claim now. Thank you. Go ahead. May it please the court, opposing counsel. First thing I want to address is counsel's argument with regard to Byrd and Lavender with regard to the assignment of the bank's note and guarantee. First of all, the representation at the Byrd case was anything other than the judgment based upon what was paid by the Nelms parties is a misrepresentation of the case. Clearly in the Byrd case, the court said that that party paid half of what was owed on the judgment and then when it assessed damages, it did so based upon that amount of payment. So if you're looking for a case that stands for the proposition as we say it does, that you only figure damages in one of these equitable contribution cases with co-guarantors based upon what was paid, the Byrd case is it in Texas. Lavender isn't it. And the reason for Lavender not being, it doesn't say one way or the other. The reason it doesn't say one way or the other is in the Lavender case, there was a CD that was used to secure the debt. It was $100,000. There's no reason in that opinion, and there's no explanation either, to think that the bank would release $100,000 security for anything less than payment. And so there you have to read between the lines. And in Lavender, what was paid was the debt. So that case can't stand for the proposition of whether or not you can assess the amount of contribution based upon what was paid versus the amount of the debt. Now the reason I— So you really are arguing that the equitable rights contribution here, then the guarantee provisions are collapsed into one analysis, essentially. Your argument is that, in other words, that he cannot, in any event, there cannot be a greater recovery than the amount that he actually paid for the assignment. Yes. Right. What— And of course, counsel also argues that that doesn't deal with, that that's really a substitution for the equitable contribution, which is a distinct question. What has been confused here by counsel both at trial, and I was the trial counsel for our side in this case, and you may have seen in the briefing and in the fee records and other things, I've actually been counsel for my parties in this case since 2009. So I know a lot about this, both factually in terms of what's happened, but as well as what the law is. In fact, in the bankruptcy court here, I'm the one that promoted the idea of the limitation of damages when a co-guarantor buys a note. But here's the problem. That has never been fully understood by opposing counsel in this case, either at trial or appeal. And that is— You better try to make sure we fully understand. Yes, yes. When the cases Byrd and Lavender say that a co-guarantor can go and buy the note from the bank, that's an issue of standing. That's it. What Judge Southwick uncovered was the language in Byrd that talks about that doesn't change the status of the relationships of the co-guarantors with each other. Then what happens is you figure damages based upon equitable contribution. So just because you can buy the note and you have standing because it's been an assignment to you, and so in theory you stand in the shoes of the bank, your recovery is limited by equitable contribution. And so what the bankruptcy court did here is apply that principle to the facts. You're saying it gives you standing. What do you mean by standing? Standing means you get standing to bring what claim? All that the Byrd and Lavender cases really stand for with regard to the ability to purchase the note is you can sue because you've purchased it. It doesn't really say what you can sue for. Those cases don't say you can— Your effort is to sue on what you did purchase, which was the note. Yes. And that allows the suit to go forward between the— What you're saying is that, well, while he might ordinarily be able to recover whatever the amount of the note against anybody that's obligated, including guarantors, whether his co-guarantor is that the amount of recovery is determined as a matter of contribution. What happened to the independent asset that he purchased? Well, he— You're treating him as if he had simply gone and paid off the bank and didn't take an assignment of the note, then what would be his rights? He would have equitable contribution rights against his co-guarantors for the amount that exceeded the amount of their—that they owe him for what he paid, the debt they discharged. Yes. The key to that question is that equitable contribution governs whatever the co-guarantor pays to the bank toward the note. And the cases are clear. Byrd, in particular, talks about— Well, I think, to me, it's pretty clear if you have three guarantors on a note and one of them goes and pays off the note, then he's got equitable rights of contribution to his co-guarantors. Yes, that's true. Now, we add to that fact pattern here that he also acquires the note. And my question is that what you're maintaining is that the rules of contribution never change, the fact that he's acquired the note because he only gives him standing. Now, I say, well, standing to do what? We're not allowing him—we're not giving him anything for that note. In other words, the note's really extinguished, and the only right he's left with is that. But that's not quite right either because his right of equitable contribution is actually capped not by how much he paid, the discharge of his co-guarantor's debt, but how much he paid for it. Do you follow that, Byrd? Well, the answer to your question is in either case, whether you go and you pay off the bank in full, in which case a note would be given back to the borrower because that's the requirement of mortgage notes is they have to be given back to the borrower. There's no effective difference here because equitable contribution is going to apply to both scenarios. And so when I say that all that buying the note does is give the co-guarantor standing, I don't mean to say that that's different than if he had paid something toward the note or had paid the note off in full. All I'm saying is that the equitable contribution limits his recovery. You look like you wanted to ask me something. No, I follow that. It seems to me that what you're arguing is that the assignment really adds nothing to anything except as an independent legal principle. You just have one co-guarantor discharging the debt, and it's his contribution. That's true. That is my position. I don't think it makes any difference whether he gets the note or not because equitable contribution applies. And what the BIRD says, if you want to look at how to figure out how to determine damages, is it says that you cannot have a situation where co-guarantors can profit from purchasing the note and then suing their co-guarantors. The Lavender case didn't change that. All right, Counselor, I think we have your argument on that. Judge, I want you to address Perani's personal liability, and part of the agreement refers to the meaning of company. Well, the stipulation in the pretrial order, as we all know, controls what happens at trial, and it's a serious undertaking to stipulate to something. What's going on here is that Perani at trial apparently didn't understand the effect of his stipulation. That's the only reason that his contested issues of law and other issues of fact that he didn't stipulate to are in the pretrial order. But the actual stipulation of fact says not just, oh, yeah, by the way, the agreement in its opening paragraph says that this is a definition. The stipulation goes way beyond that. The stipulation says in the settlement agreement as a whole, in the settlement agreement, it is defined, the company is defined to include Perani, and there's no doubt that that's what the stipulation says. Any argument by opposing counsel, both at trial and here, that it means something else flies in the face of the actual language, and so it's stipulating to a fact and then going to trial binds you to it. I've cited cases in the brief about that. Which is your best case, do you think? I started talking about my notes in front of me. You could say they're all good. Well, on this, we cited a Fifth Circuit case, 1988, Morris v. Homeco International, for the express proposition that once the pretrial order is entered, it controls the scope and course of the trial, and it binds the party to that stipulation. So what Perani is trying to do now is he's trying to get out of the stipulation. He's trying to get this court to do it. What's the language of the stipulation? The stipulation says— It doesn't say as a whole, which you just inserted. Sorry, I'm a little under the weather, so I'm having some trouble focusing. The settlement agreement defines all of defendants collectively as H&M and all of Plaintiff Aziz and Circle Sherman as the company. So when it says the settlement agreement, it doesn't say just one provision of the settlement agreement. It says the whole settlement agreement. That's why I said the whole when I was arguing a minute ago. Let us say we find less than total clarity in that language. Once you work with the settlement agreement itself, is there enough there for us to say you are correct and that Perani is individually liable? Yes. If you look at the settlement agreement in Section 3.1a, which is what the appellant relies upon here to try to redefine for the agreement what the company means, 3.1a through—I think it's a D—says that the following language from a prior court order, and then after that it quotes what that language is, and that's the only reason that there is a different mention of what company means. In addition, 3.1a and the following letter provisions are meant only to explain who the members of H&M and Circle Sherman are. That's it. That's the only thing that you can read into it. If the court finds that there is an ambiguity, the district court actually explained what it thought about that, and the district court said that extrinsic evidence would be, Perani testified at trial that there was going to be a separation of parties, that that was the intent. To have there be no authority in Circle Sherman, no profit in Circle Sherman, and so forth for H&M, but yet still have responsibility would fly in the face of the Section 3.1 that says that H&M is not supposed to be responsible for any losses of the company. That provision, that there are not supposed to be any losses of the company, falls before this 3.1a that is limited in its scope to just what the prior court order says. So if you look at the overall agreement, there's a lot of references to the company. Opposing counsel argued that common sense would dictate those only refer to Circle Sherman. The reason that's not true is because Circle Sherman, or the company, is defined to include Circle Sherman and Perani and Mr. Aziz, who's not a party here, and then it goes on and talks about company responsibilities. The intent in trying to separate the parties is that company responsibilities also belong to Mr. Perani and Mr. Aziz. Why would they have written in the drafting explicitly personal guarantee as to your membership interest, but then referred to the company only when it came to the guarantee? I'm sorry. I'm not sure what you're referring to. Isn't it true that there was a personal guarantee for Aziz and your client? Yes. As to the investment, the membership investment. But then when you get to the guarantee portion, they clearly knew how to write that language that didn't. Well, the contract is inconsistent in that respect, and so that would lead me back to my argument I mentioned earlier, that if the contract is ambiguous in your view, that the extrinsic evidence comes into play. Not only did Mr. Perani state in his testimony in the trial that the intent of the agreement was the parties were supposed to separate, it was shown in trial that he took full advantage of the losses that were passed through, especially in 2011, 100 percent to him. Would you decide that in the first instance because you're saying the district court, the bankruptcy court, the district court essentially did conclude in the event of ambiguity? The bankruptcy court concluded in effect. I remember that. Did the district court? I mean, obviously, the district court accepted. What did the district court say about that? Well, the district court included the finding that Mr. Perani had taken all of the tax losses as a personal benefit in 2011. It included that by including the whole opinion from the bankruptcy court. The district court then added to that that Mr. Perani had also testified that there was supposed to be a total separation of the parties and that based on those items that the contract then would obligate him as a result of his benefit of the agreement to be bound by the obligation to release the H&M parties. So there was a question asked in the opening argument about the deficiency, and the answer was that the bankruptcy court didn't get to any affirmative defenses. In this circuit, this court can certainly behold that the facts show that there was no deficiency. I don't have a case site in front of me, but that's the law in this district. In fact, there was an opinion out of this court late last year with regard to that very thing. The proof here all went, if you look at what the bankruptcy court said, it talks about the value being stated by H&M in its 2011 tax return of being $3.5 million. It says that Mr. Perani, consistent with that, had stated in the Circle Sherman bankruptcy that the value was $3.5 million. It also talked about how Mr. Perani had taken the stance in state court that the value of the property at foreclosure was $3.29 million, and the court, in addition, found that the testimony of the expert witness to Mr. Perani at trial was not to be trusted. I dropped that on a footnote. So if you look at the facts on that issue, the bankruptcy court clearly found facts that support that there's no deficiency, because if you— You're saying if we were to let Perani go forward on breach of contract, there wouldn't need to be a remand for the deficiency determination because the record is conclusive? Yes. Yeah, the court's already found that those are the facts that recognize those in its findings, and then also found that Perani's counter-evidence was not—was untrustworthy. Your work, counsel. Thank you. Thank you. Thank you, Your Honors. Picking up basically where things left off, on the issue of deficiency, if there's a remand, there's conflicting evidence, although there was some—there was one appraisal by Mr. Perani. There are other appraisals by the other side. There's conflicting evidence on the issue of deficiency. The court said it didn't decide it. So, yes, that would simply have to go back. My understanding of Texas law is that it's actual fair market value, that there's no—the deficiency, if it was a fair price paid by the bank at whatever the foreclosure was, insofar as the deflated price is paid at foreclosures, that's not good enough. You're looking at the actual fair market value of the property at the time of foreclosure. That's correct. Well, and that's an affirmative defense. There has to be a motion made and raised by the party against whom the deficiency is sought seeking to raise that issue, that in fact there was an underpayment and the fair market value at the time of foreclosure was greater than the amount paid. A willing purchaser would pay to a willing seller is what we're talking about. Yes, yes. Okay. And there's just not—there's not definitive evidence on that point. With respect— But his strong statement about extrinsic evidence already having been looked at to resolve any ambiguity and inconsistency. I understand that Judge Schneider made that comment, but there is—if the court simply looks at the settlement agreement itself, and that's what I think you're talking about, not the deficiency issue, but the settlement agreement, what the meaning is, looks at the settlement agreement itself as well as the pretrial agreement, the court will find that the definition simply—that that extrinsic evidence doesn't say what the conclusion was drawn before says. And Judge Higginson, you came up with one of the best examples, which is if you look in the settlement agreement itself, in Article II, the settlement agreement says that's the place where the company undertakes to repurchase the membership interest of the H&M parties. And again, it's the word the company. And yet at the end of that article, there's the need to insert a specific guarantee for Aziz and Parani. If they were already included in the company in that obligation and understood to be so, there would have been no need for that separate guarantee. So the parties themselves, I submit, notwithstanding the definition in the preamble, they understood that the company, for the most part, referred only to the Circle Sherman, the company. And we've seen this several times throughout there, where it talks about membership interest in the company, capital calls by the company. Company is a member-managed company. In 3.1 itself, when he says that the definition which restricts it to Circle Sherman is just 3.1 but not otherwise, that's simply not true. Section 3.3 and 3.5 all refer to H&M as a member or membership interest with respect to the company, all referring to the company as Circle Sherman. So again, under Morietti, if you look at the entire contract, you will see that company means Circle Sherman almost exclusively, and particularly in this section where it's redefined, does not include Mr. Parani. Very briefly, following up on Judge Higginbotham's question, in the Lavender case, I believe the court there specifically went on to address this issue of conflating the equitable rights and legal rights when it says, therefore, when Bunch acquired the note from Hibernia, he stepped into the shoes of Hibernia, having the same rights which Hibernia possessed. Now that's tempered later on by the fact that the co-guarantor has to honor his own contributive share, but he gets to sue as Hibernia would on the amount of the original note. And in fact, even in Lavender itself, right after it does that calculation, they say Byrd's contributive share would be one-sixth of the note. So respectfully, Your Honors, because Mr. Parani obtained assignment of this debt and the guarantee he was entitled to enforce it, the court should reverse and remand. Thank you. Thank you both for helping us understand this case better. That is it for the arguments for today. We will be in recess until tomorrow morning.